1
2
3
4
5
6
7
8               IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CLARK ROBINSON,

11               Petitioner,                    No. CIV S-10-2089 LKK CHS

12        vs.

13   MATTHEW CATE.

14                        FINDINGS AND RECOMMENDATIONS

15   _____/

16                        I.  INTRODUCTION

17          Robinson, a state prisoner, proceeds pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  At issue are his 2006 convictions in the Sacramento

19   County Superior Court, case number 05F03831, for which he is serving a life sentence without

20   the possibility of parole.

21                        II.  BACKGROUND

22          The California Court of Appeal summarized the facts of Robinson's offenses in

23   an unpublished opinion on direct review:

24          On Thursday, May 5, 2005, in the early evening hours, R.T. was
             hanging out in the Oak Park area of Sacramento when he overheard
25          an acquaintance, Markus Mayers, and another man, Gerald Ellis,
             say something about doing a "lick" on the "pill man." They asked
26          R.T. to participate, but he declined.

                                    1

In the parlance of the street, a "lick" is a robbery. The "pill man" was an individual named Donald Willis, who lived in Sacramento and purportedly sold pills containing methylenedioxymethamphetamine, commonly known as Ecstasy.

Mayers had been an acquaintance of Willis for many years and had visited his house perhaps a month earlier. He and Ellis mentioned that Willis used to live in their neighborhood but had gotten money and began acting "funny" and "big headed."

R.T. hitched a ride to Oakland in Ellis's car with Mayers, Ellis and a fourth man. They arrived at 77th Avenue in Oakland around 10:00 or 11:00 p.m. and got out of the car. Later, Mayers and Ellis told R.T. they were going back to Sacramento, but R.T. decided to stay in Oakland. In the early morning hours of Friday, May 6, R.T. saw Mayers and Ellis get back into the car with Carlos Foster and [Robinson] and drive away.

At the time, Willis was living at 1019 Clinton Road in Sacramento with his girlfriend, A.J., and A.J.'s daughter D. Also present in the home that night were D.L. and D.L.'s boyfriend, R.S.

At approximately 5:30 a.m., on May 6, someone fired a shotgun into the side of the Willis home just below the master bedroom window. A.J. awoke to see a man climbing through the bedroom window holding a "Rambo gun" (the first intruder). The first intruder was followed closely by two others, the second intruder and the third intruder. The first and second intruder wore ski masks, but not the third intruder. The third intruder was armed with a handgun.

The first intruder immediately climbed onto the bed and began beating Willis on the head with his gun and asking where Willis kept his money. The second intruder walked through the bedroom and out the door, while the third intruder remained with the first. The first intruder eventually got off of Willis and searched through Willis's pants, which Willis had left on the floor. The first intruder then forced Willis to get up and he and the third intruder walked Willis into a nearby bathroom.

The third intruder remained with Willis while the first intruder searched the home. Later, the first intruder came back into the bedroom and asked A.J. for Willis's car keys. A.J. gave him the keys, and the first intruder walked out the front door of the house, followed at a distance by A.J. The first intruder ordered A.J. back into the house. The first intruder came back into the house and asked Willis where he was hiding the rest of the money. Willis directed him to a dresser drawer. The first intruder told A.J. to get the money from the drawer, and she did so. A little while later, the first intruder walked past the bathroom, said something to the third intruder, and then walked out of the house. The third intruder shot

Willis in the head with the handgun and then he too left.

Willis was pronounced dead at the house at 6:05 a.m.

A.P. lived near Willis. That morning he was letting his cats outside when he heard a loud bang followed by screams. He heard footsteps and saw someone run past his house. A.P. then observed a car go by that matched the description of the one in which R.T. had traveled to Oakland. It was accelerating rapidly and had three or four people inside.

At the time of the murder, Ellis was living in Sparks, Nevada. C.B. is Ellis's mother-in-law, Mayers's aunt and the aunt of [Robinson]'s sister. On the morning of May 6, C.B. was babysitting Ellis's daughter at his house, because Ellis was supposed to be gone for a couple of days. However, at approximately 8:30 a.m., she saw someone walk into the back yard, followed by Mayers and [Robinson]. She then saw Ellis walk into the house. At that point, C.B. departed. C.B. later identified the first person who came into the yard as Foster.

Later that day, Ellis borrowed a car from L.C., paying him $100, and telling L.C. he needed the car to pick up his family in Sacramento. Ellis told L.C. he would return the car later that evening. L.C.'s wife accompanied L.C. and Ellis to Ellis's house to turn over the car. While there, she observed [Robinson], Mayers and a third man she did not recognize.

Ellis did not return the car as promised.

The next day, Oakland police officers arrested R.T. after they found him in possession of a handgun. R.T. claimed Foster had given him the gun seconds earlier.

On Sunday, May 8, at approximately 10:39 a.m., police officers discovered L.C''s car parked on 76th Avenue in Oakland. Inside were [Robinson] and Foster, both of whom were asleep. The officers approached and observed a handgun in the waistband of Foster's pants and a shotgun between [Robinson]'s legs. The officers secured the weapons and arrested the two men. They found a magazine clip and 13 bags of marijuana in the car and $587 on Foster. [Robinson] gave the officers a false name.

It was later determined a shotgun shell discovered in the Willis residence after the murder was fired from the shotgun found with [Robinson], and the bullet that killed Willis was fired from the handgun found in Foster's waistband.

A.J. later identified Foster in a photographic lineup as the third intruder.

> Mayers, Ellis, Foster and [Robinson] were charged with murder and robbery. Foster was also charged with enhancements for having fired a firearm causing great bodily injury, [Robinson] and Ellis were charged with enhancements for personally using a firearm in connection with the offenses, and Mayers was charged with enhancements for being armed. The four were tried together before three juries, one each for Mayers and Ellis and one for [Robinson] and Foster.

*People v. Robinson*, No. L 1483126, 2009 WL 1483126, at 1 -3 (Cal.App. 3 Dist., 2009).

On this evidence, a jury convicted Robinson of robbery and murder and found true that he used a firearm in connection with each offense.  The trial court sentenced him to life without the possibility of parole for the murder plus 10 years for the weapon enhancement; sentencing on the robbery count was stayed.

Robinson appealed his convictions to the California Court of Appeal, Third District, where judgment was affirmed in an unpublished opinion.  Petition for review to the California Supreme Court was denied.  The parties agree that Robinson exhausted state remedies with respect to the claims presented.  Respondent asserts, however, that two of the grounds are procedurally barred in this court, as will be discussed herein.

### III.  GROUNDS FOR RELIEF

The petition presents five grounds for relief:

A.  Admission of R.T.'s May 8, 2005 involuntary out-of-court statements violated Robinson's right to a fair trial;

B.  Defense counsel rendered ineffective assistance at trial by failing to object to the admission of R.T.'s out-of-court statement;

C.  R.T. gave perjured trial testimony which prosecutor knew or should have known in advance would be false;

D.  The prosecutor committed prejudicial misconduct during closing argument; and

E.  Insufficient evidence supported the first degree murder conviction.

For the reasons that follow, these grounds are without merit and relief should be denied.

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); see also *Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under the AEDPA, federal habeas corpus relief is also precluded for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

This court looks to the last reasoned state court decision to determine whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919.  The state court's factual findings are presumed correct if not rebutted with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004).  It is the habeas corpus petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law.  *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

/////

/////

## V.  DISCUSSION

A.      Admission of R.T.'s May 8, 2005 Out-of-Court Statements

1.      Additional Background

In May 2005, Detective Ron Garverick was working for the Sacramento County Sheriff's Department investigating the Willis murder.  On May 8, 2005, he drove to Oakland to interview R.T., who had been arrested the night before for possession of a firearm and was still in custody.  (*See* Clerk's Transcript ("CT") at 1569-1668.)  In that interview, R.T. identified Willis as the "pill man" and volunteered that he knew what happened in connection with Willis's murder.  In particular,

> R.T. said he overheard someone in Sacramento say they were going to "lick the pill man" and wanted him to participate.  R.T. said three or four people were involved, including Mayers and Ellis.  R.T. said he rode to Oakland with Mayers and Ellis and saw them leave Oakland later that night with [Robinson] and a "little short dude with dreds" named Carlos.  R.T. said he always saw [Robinson] and Carlos together and they always had guns.  Finally, R.T. said the gun he was arrested with had been given to him only seconds earlier by Carlos.

*People v. Robinson*, 2009 WL 1483126, at 3.

Subsequently, a defense investigator interviewed R.T. in San Quentin Prison.  R.T. told the defense investigator that Mayers did not say anything about doing a "lick" and further said he had lied to the police when he said otherwise on May 8.  R.T. said he was high on Ecstasy during the May 8 interview.

After learning that R.T. had partially recanted his May 8 statement, Garverick traveled to San Quentin to interview him again.  By this time, Garverick was working as an investigator for the Sacramento County District Attorney and he was accompanied by a deputy district attorney.  During this interview, R.T. complained that he had been told earlier the police would help him with outstanding warrants but they had done nothing.  Garverick asked R.T. if his May 8 statements were true, and R.T. refused to say anything.  R.T. asked what they were going to do for him and said he could help them if they helped him.  R.T. eventually said Mayers

1  had nothing to do with the murder and he would give Mayers an alibi.

2          On appeal, the state court summarized R.T.'s subsequent trial testimony:

3          At trial, R.T. testified that he entered into an agreement with the
           district attorney whereby a charge for violating probation would be
4          dismissed if he testified truthfully in this matter. Part way into his
           testimony, R.T. asked to speak with his attorney. Thereafter, the
5          prosecutor put on the record that R.T. was concerned he would be
           prosecuted for having made false statements to police
6          investigators. The prosecutor indicated R.T. would not be
           prosecuted for anything he said to investigators if he testified
7          truthfully at trial.

8          R.T. thereafter testified he rode to Oakland with Mayers and Ellis
           but that, after they arrived, Mayers and Ellis walked off and he
9          never saw them again that night. R.T. testified he saw [Robinson]
           that night, spoke with him briefly, and then saw [Robinson] walk
10         away. He did not see him again until the next evening. R.T.
           acknowledged receiving the handgun from Foster seconds before
11         R.T. was arrested.

12         R.T. testified he did not tell police officers the truth when he was
           first interviewed. He said he lied about knowing the "circle" that
13         did the "lick" on the "pill man." He said that while he heard
           someone say something about doing a "lick," it was not Mayers.
14         Nor did Mayers ask him to participate. R.T. testified he told the
           officers Mayers was involved because they offered him money for
15         names. R.T. said he told the officers three or four people were
           involved, because they showed him four pictures at the time. R.T.
16         said he lied to the police because they offered him money, he was
           trying to get out of jail, and he was high on Ecstasy. R.T. said he
17         smuggled drugs into the jail in his socks and had taken them before
           the interview. Although R.T. later testified he saw [Robinson] and
18         Foster leave in the car with Mayers and Ellis, he also said he did
           not see Mayers and Ellis drive away. R.T. said he lied to the police
19         that he saw [Robinson] and Foster drive off with Mayers and Ellis,
           because that is what the officers wanted to hear. R.T. testified that,
20         during the first interview, he was trying to get information about
           the incident from the officers so he could feed it back to them in
21         order to get a deal in order to get out of jail.

22         The prosecutor impeached R.T.'s trial testimony by playing a tape
           of his May 8 interview. The jury also heard a tape of R.T.'s later
23         interview by Garverick in prison.

24  *People v. Robinson*, 2009 WL 1483126, at 4.

25  /////

26  /////

2.      Analysis

Robinson contends his right to a fundamentally fair trial was violated when the trial court admitted R.T.'s May 8, 2005 out-of-court statements to law enforcement as impeachment evidence because the statements were involuntary and thus inadmissible for any purpose.  Presented with this claim on appeal, the state court held it was forfeited for defense counsel's failure to object at trial.  Respondent asserts this claim is procedurally barred because its rejection in state court was based on application of California's contemporaneous objection rule, an independent and adequate state procedural bar.

As a general rule, a federal habeas court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Calderon v. United States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  For a state procedural rule to be independent, the state law basis for the decision must not be interwoven with federal law.  *LaCrosse v. Kernan,* 244 F.3d 702, 704 (9th Cir. 2001).  To be deemed adequate, it must be well established and consistently applied. *Poland v. Stewart*, 169 F.3d 575, 577 (9th Cir. 1999).  An exception to the general rule exists if the prisoner can demonstrate either cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.

Once the state has pleaded the existence of an independent and adequate state procedural ground as an affirmative defense, the burden shifts to the petitioner to place the adequacy of that procedural rule in issue, as "the scope of the state's burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner." *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir. 2003).  If placed in issue, the state retains the ultimate burden of proving adequacy of the asserted bar.  *Id*. at 585-86.

/////

Here, Robinson has placed the procedural default defense in issue by arguing that it is neither independent nor adequate.  It is noted that the Ninth Circuit has held California's contemporaneous objection rule to be independent and adequate on various occasions, affirming the denial of a federal petition on grounds of procedural default where there was a failure to object to at trial.  *E.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (jury instruction claim procedurally barred for failure to object); *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002) (citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981); *LaCrosse*, 244 F.3d at 704 (holding that the contemporaneous objection rule is an independent state bar because it is not interwoven with federal law or dependent upon a federal constitutional ruling); *Rich v. Calderon*, 187 F.3d 1064, 1069-70 (9th Cir. 1999) (declining to review various prosecutorial misconduct claims as procedurally barred for failure to contemporaneously object).

Here, however, this court need not decide whether Robinson's claim regarding R.T.'s testimony is procedurally barred because the claim clearly lacks merit.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (holding that for reasons of judicial economy an appellate court may pass on deciding complicated procedural bar issues when a petition is "easily resolvable against the habeas petitioner" on other grounds); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar.").

The United States Constitution demands that confessions be made voluntarily in order to be admissible at trial.  *Lego v. Twomey*, 404 U.S. 477, 478 (1972).  A confession is voluntary if it is "the product of a rational intellect and a free will."  *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)); *see also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  The test for voluntariness, however, is not a simple question of whether the suspect spoke of free will.  Rather, "coercive police activity is a

1   necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the

2   Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167

3   (1986).

4          Regardless, Robinson lacks standing to complain about the alleged infringement

5   of R.T.'s constitutional rights.  In general, a proponent must assert his own legal rights and

6   interests rather than basing his claim for relief on the rights of third parties.  *See generally Rakas*

7   *v. Illinois*, 439 U.S. 128, 139-40 (1978).  Robinson fails to cite any federal authority

8   demonstrating that a violation of his rights flows from the alleged violation of the rights of R.T.

9   A search reveals no Supreme Court authority addressing the admissibility of third party

10  statements allegedly obtained through police coercion, nor does the conclusion urged by

11  Robinson clearly flow from any identified Supreme Court precedent.  Accordingly, habeas

12  corpus relief is not available.  *See Carey v. Musladin*, 549 U.S. 70, 77 (holding a state court's

13  decision cannot be contrary to, or an unreasonable application of, clearly established federal law

14  if there is a "lack of holdings from" the Supreme Court).

15         Moreover, as the state court determined, Robinson fails to demonstrate that R.T.'s

16  statements were involuntary:

17             Although R.T. testified that the police suggested he would receive
               money for names, R.T. also indicated he did not want money but a
18             release from jail. R.T. was given no such promise. And R.T.'s
               claim that he was high on drugs during the interview, despite
19             having been in jail since the night before, is at best suspect. And
               while it is possible R.T. was exaggerating what he knew in order to
20             gain some advantage with the authorities, there is little to suggest
               R.T.'s statements on May 8 were not voluntary. The fact R.T.'s
21             statements may have been false or exaggerated does not make them
               involuntary.
22

23  *People v. Robinson*, 2009 WL 1483126, at 5.

24         In any event, assuming solely for purposes of this discussion that the statements at

25  issue were the product of police coercion and that Robinson has stated a valid claim for relief, he

26  still fails to establish that admission of the evidence rendered his trial fundamentally unfair in

1   violation of due process.  Robinson "did not lack the opportunity to test the voluntariness and

2   veracity of [R.T.'s] testimony through cross-examination."  *Williams v. Woodford*, 384 F.3d 567,

3   596 (9th  Cir. 2004) ("[T]here was no violation of due process when the witness, who was

4   previously illegally interrogated, was subject to cross-examination at trial through which the jury

5   could assess the witness's credibility." (describing *United States v. Mattison*, 437 F.2d 84, 85

6   (9th Cir. 1970) and noting defense counsel in that case had the opportunity to cross-examine the

7   third party witness "about the coercive police tactics employed at his [ ] interrogation"); *see also,*

8   *generally*, *United States v. Moody*, 778 F.2d 1380, 1384-85 (9th Cir. 1985) (rejecting the

9   argument that witness testimony pursuant to a plea agreement is so unreliable as to violate due

10  process by pointing out that the witness's motivation for testifying can be explored through

11  cross-examination).

12          R.T. was thoroughly cross-examined by Robinson's attorney as well as his co-

13  defendants' attorneys so that the jury was afforded the opportunity to assess his credibility.  No

14  due process violation resulted from the admission of R.T.'s statements or the video recording of

15  his interviews.

16          B.      Ineffective Assistance

17          In a related claim, Robinson contends trial counsel rendered ineffective assistance

18  by failing to object to the admission of R.T.'s May 8, 2005 statements as discussed in the

19  previous subsection.

20          To demonstrate a denial of the Sixth Amendment right to the effective assistance

21  of counsel, a petitioner must establish that counsel's performance fell below an objective

22  standard of reasonableness, and that he suffered prejudice from the deficient performance.

23  *Strickland v. Washington*, 466 U.S. 668, 690 (1984).  Deficient performance requires a showing

24  that counsel's performance was "outside the wide range of professionally competent assistance."

25  *Id*. at 687 & 697.  Prejudice is found where there is a reasonable probability that, but for

26  counsel's unprofessional errors, the result of the proceeding would have been different.  *Id*.

1    The United States Supreme Court recently observed once again that

2  "[s]urmounting *Strickland's* high bar is never an easy task."  *Harrington v. Richter*, 131 S. Ct.

3  770, 787 (2011) (citing *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)).  Establishing an

4  unreasonable application of *Strickland* by a state court is all the more difficult: Under 2254(d),

5  the relevant question is not whether counsel's actions were reasonable, but rather, whether there

6  is any reasonable argument that counsel satisfied *Strickland's* deferential standard.  *Harrington v.*

7  *Richter*, 131 S. Ct. 770, 788 (2011).

8    In the last reasoned state court decision applicable to this claim, the state court

9  held Robinson failed to state a valid claim and failed to demonstrate prejudice:

> [Robinson]'s argument that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms is contained in a single sentence in which he asserts counsel's failure to object "deprived [him] of his right to a fair trial because [R.T.]'s May 8, 2005, statement was coerced and, therefore, inadmissible at [ ] trial."
>
> As we explained recently in *People v. Mitchell* (2008) 164 Cal. App.4th 442, at page 467: "'[T]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel.' [Citation.] If, as here, the record fails to show why counsel failed to object, the claim of ineffective assistance must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation. [Citation.] 'A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' [Citation]."
>
> [Robinson]'s ineffective assistance argument does not even begin to explain how his counsel's failure to object fell below the standard of a reasonably competent attorney. [Robinson] does not address the issue of professional norms, merely assuming any mistake by counsel amounts to ineffective assistance. However, effective assistance does not mean perfect assistance. Every mistake by trial counsel does not thereby amount to ineffective assistance. Nor does [Robinson] address whether there could have been a tactical basis for counsel's failure to object.
>
> [....]
>
> [Robinson] also fails to establish prejudice. The record before us does not show R.T.'s statements on May 8 were involuntary or coerced. We recognize that the investigators suggested to R.T. that he would receive money for information. But, R.T. made it clear

1    this was not all that he wanted. He wanted to get out of jail.
     However, the investigators told R.T. they had no power to make
2    this happen. And, as we have indicated, R.T.'s claim to have been
     high on drugs during the interview is dubious at best. R.T. was not
3    so high that he could not try and use the information he had to his
     advantage. Hence, if defense counsel had objected to the
4    introduction of R.T.'s May 8 interview on the ground of coercion,
     it is not reasonably likely the court would have sustained the
5    objection.

6    We [ ] conclude [Robinson] has not established counsel's failure to
     object amounted to ineffective assistance.

7

8    *People v. Robinson*, 2009 WL 1483126, at 5 -6.

9           For the reasons set forth by the state court and in the previous subsection,

10   Robinson fails to demonstrate that counsel's performance was deficient or that an objection to

11   R.T.'s out-of-court statements would have been successful.  The state court's denial of this claim

12   for failure to state a claim and for lack of prejudice was neither contrary to, nor an unreasonable

13   application of the *Strickland* standard.

14          C.     Motion for New Trial/ Perjured Testimony

15          Following conviction, Robinson moved for a new trial based on newly discovered

16   evidence.  The alleged newly discovered evidence was the fact that, after trial, the prosecution

17   sought and obtained a judicial determination that R.T. had given perjured testimony; in essence

18   the defense claimed the prosecution knowingly presented false testimony at trial.

19          The trial court denied the motion, concluding there was nothing new about the

20   fact that R.T. presented false testimony at trial, and news that R.T. had been found to be a liar

21   would not have affected the jury's verdict.  *People v. Robinson*, 2009 WL 1483126, at 7.

22   Robinson claims a violation of his right to due process.

23          It is well settled that a conviction obtained using knowingly perjured testimony

24   violates due process (*Mooney v. Holohan*, 294 U.S. 103, 112 (1935)), and "must be set aside if

25   there is any reasonable likelihood that the false testimony could have affected the jury's verdict."

26   *United States v. Bagley*, 473 U.S. 667, 680 n.9 (1985); *Morales v. Woodford*, 388 F.3d 1159,

1179 (9th Cir. 2004) ("The due process requirement voids a conviction where the false evidence

is 'known to be such by representatives of the State.'") (quoting *Napue v. Illinois*, 360 U.S. 264,

269 (1959)).  Relief based on the introduction of perjured testimony at trial is available only if

the testimony was actually false.  *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008).  In

addition, the prosecution must have actually known or should have known that the testimony was

false.  *Id*.; s*ee also Morales*, 336 F.3d at 1151-52 ("The essence of the due process violation is

misconduct by the government, not merely perjury by a witness.") (citing *Napue*, 360 U.S. at

491-92) (overruled on other grounds).  In sum, if the prosecution used perjured testimony that the

prosecutor knew (or should have known) was false, and the testimony is material- that is,

reasonably likely to have affected the verdict- the defendant's conviction must be reversed.  *See*

*United States v. Agurs*, 427 U.S. 97, 103 (1976); *Jackson*, 513 F.3d at 1075-76.

        Presented with a claim of error as to the denial of the motion for new trial, the

state appellate court held in the last reasoned opinion applicable to this claim:

> The present matter does not involve any improper use of perjured
> testimony by the prosecution to advance its cause. First, it is
> unclear on this record if the prosecution knew R.T. would lie on
> the stand. Shortly after the murder, R.T. had given information to
> the police that was damaging to [Robinson] and the others. Later,
> R.T. was visited in prison by a defense investigator and apparently
> revised his account in a way more favorable to the defendants. R.T.
> was then visited by members of the prosecution team. R.T. refused
> to affirm his earlier statements to police, complaining that he had
> expected to receive some benefit from his earlier statements but
> instead remained in prison. He told the prosecution team they
> would not get anything from him because they put him in prison.
> At one point, R.T. said he would testify for Mayers and provide
> him with an alibi. However, when the prosecution investigator
> suggested to R.T. that if Mayers has a way out of this case then he
> (Mayers) would be cleared, R.T. responded: "He ain't got no way
> out, because he was with that dumbass. Them motherfuckers is
> dumb."
>
> R.T.'s prior statements to the investigators suggested he might lie
> in his trial testimony to protect Mayers. However, the prosecution
> could well have believed that, once placed under oath on the stand,
> R.T. would instead tell the truth about what he knew in order not to
> compound his own problems.

> At any rate..., the perjured testimony of R.T. was damaging to the prosecution. Thus, even if the prosecution knew R.T. would lie, it did not present those lies in order to gain an unfair conviction. Rather, the prosecution presented the testimony safe in the knowledge that, if R.T. lied, he could be impeached with his prior inconsistent statements. In this way, the prosecution was able to get everything before the jury and let the jury sort out which version of R.T.'s account was accurate, thereby advancing rather than impeding the search for truth and justice.

*People v. Robinson*, 2009 WL 1483126, at 8 -9.

Thus, it is not disputed that R.T. gave trial testimony that was false, prompting the prosecutor to impeach him with his prior inconsistent statements to law enforcement. The prosecutor then argued to the jury that R.T. was a liar and that the May 8, 2005 interview, which took place just days after the murder, was his most reliable account. Following Robinson's trial, the prosecutor obtained a judicial finding that R.T. had testified untruthfully at Robinson's trial. The judicial finding prevented R.T. from benefitting from his agreement with the prosecution to testify truthfully in exchange for the dismissal of petitions for violation of his probation.

Robinson fails to demonstrate misconduct by the government, however, as there is no evidence that the prosecutor knew which way R.T. would testify at trial. Contrary to Robinson's argument, as the state court reasoned, "the prosecution could well have believed that, once placed under oath on the stand, R.T. would instead tell the truth about what he knew in order not to compound his own problems." *People v. Robinson*, 2009 WL 1483126, at 9. As set forth, prior to R.T.'s testimony, he and the prosecutor entered into an agreement wherein R.T. agreed to testify truthfully at Robinson's trial. It thus appears the prosecutor anticipated, or at least hoped, that R.T. would take the stand and testify truthfully. Under these circumstances, Robinson fails to demonstrate that the prosecution knowingly presented R.T.'s false testimony in order to mislead the jury into believing R.T.'s version of events. *See United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (prosecutor's presentation of contradictory testimony not improper unless prosecutor knows statements constitute perjury); *United States v. Olano*, 62 F.3d 1180, 1197 (9th Cir. 1995) ("[A] prosecutor can never guarantee that a witness will not commit

1  perjury.  Her duty is to refrain from knowingly presenting perjured testimony and from

2  knowingly failing to disclose that testimony used to convict a defendant was false." (citing

3  *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991)).

4          Moreover, the prosecutor did not rely on the substance of R.T.'s perjured

5  testimony to make the case against Robinson and it is apparent from the verdict that the jury

6  rejected the perjured portion of his testimony.  In this sense, Robinson additionally fails to

7  demonstrate the testimony was material because it did not assist the government in obtaining his

8  conviction.  *See United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) ("In assessing

9  materiality under *Napue*, we determine whether there is any reasonable likelihood that the false

10 testimony could have affected the judgment of the jury; if so, then the conviction must be set

11 aside." (quoting *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005)).  Under these

12 circumstances, the state court's rejection of the claim was not contrary to, or an unreasonable

13 application of clearly established federal law.

14          D.      Prosecutorial Misconduct

15          Robinson claims the prosecutor committed misconduct by arguing to the jury that

16 he was guilty merely by association.  Presented with this claim on appeal, the state court held it

17 was forfeited for defense counsel's failure to object at trial.  Respondent asserts this claim is

18 procedurally barred.  Once again the asserted procedural bar need not be addressed since the

19 claim clearly lacks merit.  *See Lambrix* , 520 U.S. at 525; *Franklin*, 290 F.3d at 1232.

20          The appropriate standard for a federal court reviewing a claim of prosecutorial

21 misconduct on habeas corpus is the narrow one of whether the conduct violated due process.  *See*

22 *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  "The relevant question is whether the

23 prosecutor's error 'so infected the trial with unfairness as to make the resulting conviction a

24 denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S.

25 637, 643 (1974)); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1983) ("the touchstone of due

26 process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

16

culpability of the prosecutor").  A challenge to a portion of a closing argument is "examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *United States v. Young*, 470 U.S. 1, 12 (1985).  Factors to be considered in determining whether habeas relief is warranted include whether the prosecutor manipulated or misstated the evidence; whether the conduct implicated other specific rights of the accused; whether the objectionable content was invited or provoked by defense counsel's argument; whether the trial court admonished the jurors; and the weight of the evidence against the defendant.  *Darden*, 477 U.S. at 181-82.  Relief is available only if the misconduct rendered the trial fundamentally unfair.  *Id.* at 181.

Here, Robinson asserts specifically that the prosecutor argued to the jury that he "was guilty by his association with his friend, Carlos Foster, and his relatives, Markus Mayers and Gerald Ellis."  He provides no additional details.  "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."  *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).  Even construing the petition liberally to include the factual allegations made to the state court on direct appeal, this claim still lacks a sufficient statement of supporting facts.  In state court, Robinson cited to various pages of the reporter's transcript containing portions of the prosecutor's closing argument in support of this argument, however review of those pages and the prosecutor's entire argument reveals no argument by the prosecutor that he was guilty merely by association.

Presented with this claim on direct appeal, the state court similarly found:

[T]he prosecutor did not, in fact, argue guilt by association.

This was a case of circumstantial evidence.  Three people entered the victim's home on the morning of May 6. The evening before, two men, Mayers and Ellis, said something about doing a lick on the pill man, i.e., the victim. [Robinson] and Foster were later seen getting into Ellis's car with Ellis and Mayers in Oakland.  They were next seen together in Sparks, Nevada, three hours after the murder.  They borrowed a car in Sparks, and [Robinson] and Foster were found in the car two days later in Oakland in possession of two of the weapons used in the home invasion.

> The prosecutor pointed out the relationships among the four perpetrators not to argue guilt by association but to argue it is logical to conclude [Robinson] and Foster were the ones who accompanied Mayers and Ellis, inasmuch as they met the descriptions of the perpetrators, were with Mayers and Ellis both before and after the crimes, and just happened to be related to them in some way.  There was nothing improper about the prosecutor's argument.

*People v. Robinson*, 2009 WL 1483126, at 14-15.  The state court reasonably held there was nothing improper about the prosecutor's argument and rejection of this claim was not contrary to, or an unreasonable application of clearly established federal law.

E.    Sufficiency of the Evidence

Robinson claims the evidence at trial was insufficient to prove beyond a reasonable doubt that he was guilty of first degree murder.  He argues the evidence showed, at most, his association with his co-defendants primarily after the crimes were committed.

The Due Process Clause of the Fourteenth Amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  On habeas corpus review, sufficient evidence supports a conviction so long as, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); s*ee also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam). Circumstantial evidence and inferences drawn therefrom may be sufficient to sustain a conviction.  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).

The *Jackson* standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 319.)  The dispositive question is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).  Under the

1   AEDPA, this court's inquiry is limited to "whether the decision of the California Court of Appeal

2   reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case." *Juan H.*

3   *v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(1)).

4       In this case, to prove Robinson was guilty of first degree murder under a theory of

5   felony murder in which a co-participant committed the fatal act, the prosecution had to prove:

6           1.    The defendant committed or aided and abetted robbery;

7           2.    The defendant intended to commit, or intended to aid and
                    abet the perpetrator in committing robbery;

8
9           3.    If the defendant did not personally commit robbery, then a
                    perpetrator, whom the defendant was aiding and abetting,
                    personally committed the robbery;

10          AND

11
12          4.    While committing the robbery, the perpetrator did an act
                    that caused the death of another person.

13  (CT at 1325; *see also* RT at 1735.)  Robinson aided and abetted a crime if he knew of the

14  perpetrator's unlawful purpose and specifically intended to, and did in fact, aid, facilitate,

15  promote, encourage, or instigate the perpetrator's commission of that crime.  The prosecution did

16  not have to prove that Robinson was actually present when the crime was committed in order to

17  be guilty as an aider and abettor, so long as the above elements were shown.  (CT at 1321; *see*

18  *also* RT at 1731-32.)

19      In his interview with Detective Garverick, which was played for the jury, R.T.

20  identified Ellis and Mayers as having discussed "licking the pill man" on the evening of May 5

21  and additionally said he was asked to participate.  When shown a photograph, R.T. identified

22  Robinson, whom he knew as "Little Clark," as also being present and stated he thought Little

23  Clark's last name was Robinson.  R.T. said Robinson left for Sacramento with Ellis, Mayers, and

24  a fourth male in the car in the early morning hours of May 6, the day of the murder. R.T. said the

25  fourth male and Robinson were "always together" and that they always had guns.  R.T. said he

26  knew this group of men committed the crime because they talked about it and then left and did

not return.  On May 7, the day after the murder, R.T. saw the same four men with various guns in their possession, including a Mac 11, a .22 caliber rifle, and a double barreled shotgun cut off at the back.  R.T. was arrested a short time later in possession of one of these guns which he claimed had just been handed to him moments prior.

Much of R.T.'s trial testimony was consistent with the statements he made in the interview.  R.T. identified a few specific statements made during his interview with Garverick which he claimed were not true.  The specific "lies" identified and corrected by R.T. included: (1) while R.T. heard people talking about doing a lick, he claimed at trial he did not hear Mayers and Ellis talking about doing a lick; (2) he claimed did not know the "little circle" who did the lick on the pill man as he said in the interview; (3) no one, particularly Mayers, asked him to be in on the lick; and (4) he lied when he said Robinson got in the car with Ellis and Mayers to go back to Sacramento on the night of the murder; rather, he testified at one point, Robinson wandered off somewhere.  That R.T. testified inconsistently at trial does not, however, negate the effect of his initial statements to Detective Garverick.  The jury could have chosen to believe that R.T. told the truth to Detective Garverick, and later lied at trial.  Under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review.  *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

The prosecutor presented circumstantial evidence of Robinson's guilt in addition to the evidence originating from R.T.  A.J., who was present in Willis's home the night of the murder, testified she was awakened by a loud noise and eventually saw three intruders climbing in her bedroom window; she identified Foster and Mayers as two of them when shown photographic lineups, and identified Foster as the intruder who shot Willis.

Within hours following Willis's murder, C.B., Ellis's mother-in-law, saw Ellis, Robinson, Mayers, and a fourth male she did not know but whom she later identified as Foster, at Ellis's house in Sparks, Nevada.  Officers discovered a garbage can containing burned items in the garage at Ellis's house and it contained a burned shirt from which Robinson's DNA profile

1   could not be excluded, among other items.

2   On the morning of May 8, Oakland police officers found Robinson and Foster

3   asleep in a car; the murder weapon was tucked into Foster's waistband and Robinson had in the

4   loaded Winchester shotgun which fired the blast below Willis's bedroom window sitting

5   between his legs.  Also in the car were several shopping receipts showing recent purchases.  A

6   glove found in Robinson's pants' pocket had characteristic gunshot residue particles, while a

7   glove found in Foster's pants' pocket also had one characteristic gunshot residue particle.

8   Considering Robinson's sufficiency of the evidence claim on direct appeal, the

9   state court held:

10   [Robinson] argues "the evidence implicating [him] is based
primarily on his association with Foster *after* the crimes were

11   committed." [Robinson] acknowledges he and Foster were arrested
in Oakland two days after the murder and were in possession of 13

12   baggies of marijuana, which provides a reasonable explanation for
why they also possessed cash and had recently made purchases.

13   [Robinson] also acknowledges that C.B. observed Ellis, Mayers,
Foster and [Robinson] at Ellis's home in Sparks three hours after

14   the murder, but asserts it only takes two hours to drive from
Sacramento to Sparks, leaving an extra hour during which "any

15   number of things could have happened including switching people
out on San Carlos, a house to which everyone was connected by

16   blood or marriage." [Robinson] argues this evidence "at most"
shows he may have been an accessory after the fact based on his

17   presence in Nevada with the others and with Foster at the time of
his arrest.

18

19   [Robinson]'s argument is based on a one-sided view of the
evidence that leaves out a number of inconvenient facts. For

20   example, [Robinson] and Foster were not just arrested in Oakland
two days after the murder in possession of cash and marijuana.

21   They were also in possession of two weapons, the shotgun used to
blow a hole in the wall below the victim's bedroom window, and

22   the handgun used to kill the victim. Foster was also wearing shoes
that matched shoe prints found at the scene. And then there's the

23   fact [Robinson] and Foster were in was the one borrowed by Ellis
in Sparks the day after the murder. [Robinson] also ignores the out-

24   of-court statements of R.T. that he saw [Robinson] and Foster get
into the car with Mayers and Ellis in Oakland the night of the

25   murder and that he had earlier heard Mayers say something about
doing a lick on the pill man. And finally, we have the descriptions

26   of the intruders by the victims, which tend to match [Robinson],
Foster and Ellis. A.J. in fact picked Foster out of a photographic

1       lineup, and R.T. stated [Robinson] and Foster are always together
    and always have guns.

2

3       A party challenging sufficiency of the evidence must summarize
    the evidence on the point, both favorable and unfavorable. (*Roemer*
    *v. Pappas* (1988) 203 Cal.App.3d 201, 208.) Failure to do so may

4       be considered a forfeiture of the argument on appeal. (*Oliver v.*
    *Board of Trustees* (1986) 181 Cal.App.3d 824, 832.) At any rate,

5       the record below contains sufficient evidence, beyond [Robinson]'s
    relationship with the other perpetrators, to support his conviction.

6

7   *People v. Robinson*, 2009 WL 1483126, at 15 -16.

8       Viewing all the evidence in this case in the light most favorable to the

9   prosecution, a rational trier of fact could have found the essential elements of first degree murder

10  beyond a reasonable doubt, and the decision of the California Court of Appeal so finding was a

11  reasonable application of the applicable standards of the *Jackson* and *Winship* standards for the

12  reasons set forth therein.  No relief is available.

13  VI.  CONCLUSION

14      For the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of

15  the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

16  appealability when it enters a final order adverse to the applicant.  A certificate of appealability

17  may issue only "if the applicant has made a substantial showing of the denial of a constitutional

18  right." 28 U.S.C. § 2253(c)(2).  For the reasons discussed, a substantial showing of the denial of

19  a constitutional right has not been made in this case.

20      Accordingly, IT IS HEREBY RECOMMENDED that:

21      1.  The petition for writ of habeas corpus be denied; and

22      2.  A certificate of appealability not issue.

23      These findings and recommendations are submitted to the United States District

24  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

25  one days after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

1  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

2  within the specified time waives the right to appeal the District Court's order.  Martinez v. Ylst,

3  951 F.2d 1153 (9th Cir. 1991).  Any reply to the objections shall be filed and served within seven

4  days after service of the objections.

5  DATED: November 14, 2011

6  _____
   CHARLENE H. SORRENTINO
7  UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26